UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AMERICAN HOTEL INTERNATIONAL GROUP, :
INC., ARAMARINE BROKERAGE, INC. ARA :
PURCHASING GROUP, INC., ASTA PG, INC., :
LIVERY PG, INC., NAA PURCHASING GROUP, :
INC., RESTAURANT GROUP, INC. d/b/a :
RESTAURANT GROUP DELAWARE, INC., SILVER :
CAR PURCHASING GROUP, INC. :

     Plaintiffs, :

    – against – :

ONEBEACON INSURANCE COMPANY and :
POTOMAC INSURANCE COMPANY OF ILLINOIS, :

     Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**01 Civ. 0654 (CM) (MHD)**

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/26/09

The Court, for its findings of fact, conclusions of law and verdict

The following facts are stipulated:

1.  Plaintiff Aramarine Brokerage, Inc. ("Aramarine") is an insurance broker.

2.  Defendants OneBeacon Insurance Company and Potomac Insurance Company of Illinois (hereinafter collectively "OneBeacon"), are affiliated property and casualty insurance companies.

3.  Aramarine and OneBeacon were involved in the placement and issuance of certain "purchasing group" policies between 1995 (when the first of those policies incepted) and 2003 (when the last of those policies expired). A purchasing group is any group composed of members whose business or activities are similar or related with respect to the liability to which members are exposed by virtue of any related, similar or common business, which has been formed for the purpose of providing insurance on a group basis.

4.      Aramarine is a New York corporation having its principal place of business from prior to 1995 to September 2001 in New York City and thereafter in Summit, New Jersey.  Joseph Elmasri is the founder, sole shareholder and only officer of Aramarine.  He is a resident of New Jersey, and is a licensed insurance broker in New Jersey, New York and more than twenty other states.

5.      OneBeacon Insurance Company was formerly known as General Accident Insurance Company of America .  Between 1995 and 1999, both companies were part of the General Accident Group of Insurance Companies ("General Accident" or "GA").  In 1999 General Accident's parent corporation, in the United Kingdom, was acquired by the Commercial Union Group in the U.K., and the combined operation (in the U.S. as well as the U.K.) became known as the CGU Group of Companies.  In 2001, an additional transaction took place in which the CGU Group of Companies were acquired by new ownership, and the name of the operation was changed to the OneBeacon Insurance Group of Companies.

6.      OneBeacon Insurance Company is a Pennsylvania Corporation and Potomac Insurance Company of Illinois is an Illinois Corporation.  Until 1999, the principal places of business of these corporations was in Pennsylvania and thereafter was in Massachusetts.  The unit at General Accident that Aramarine dealt with in 1995 at the beginning of Aramarine's relationship with General Accident until 2000, when that relationship was terminated, was called the Global and National Accounts Unit, which was headquartered in Philadelphia.

7.      A number of written agreements were entered into between Aramarine and OneBeacon, as to which the parties have varying contentions (as described below).  Aramarine and OneBeacon (then General Accident) entered into a Broker's Agreement dated March 15, 1995.  OneBeacon terminated the Broker's Agreement on August 15, 2000.

2

8.     Aramarine and OneBeacon also entered into an Insurance Program Manager Agreement dated February 7, 2000. OneBeacon terminated the Insurance Program Manager Agreement on August 29, 2000.

9.     There are five "purchasing groups" as to which Aramarine contends it is entitled to further commissions.

10.   The first ARA Purchasing Group was initially subject to a three-year policy for the period March 15, 1995 to March 15, 1998. Individual insureds within this program non-renewed their coverage, effective March 15, 1996.

11.   Coverage for the ARA Purchasing Group was subsequently issued by OneBeacon beginning March 1, 1998 and continued (under various policies) until March 1, 2002.

12.   Coverage for the Associated Restaurant Management Group ("ARM Group") was written beginning June 1, 1995 and continued (under various policies) until July 1, 2002.

13.   Coverage for the NAA Purchasing Group was written beginning August 15, 1996 and continued (under various policies) until December 31, 2002.

14.   A policy was issued by OneBeacon to the ASTA Purchasing Group for the period February 1, 2000 to February 1, 2003.

15.   A policy was issued by OneBeacon to the Silver Car Purchasing Group for the period October 1, 1998 to February 28, 2002.

16.   OneBeacon terminated all of its agreements with Aramarine by correspondence sent and received in August 2000.

3

**The following facts are found by the Court, sitting as trier of fact:**

Aramarine's Business

1.     Joseph Elmasri is the founder, sole shareholder and only officer of Aramarine.  Elmasri is licensed as a producer in the State of New Jersey and as a non-resident insurance broker or agent in New York and more than twenty other states.

2.     Aramarine is a licensed insurance brokerage firm that specializes in devising and placing large multi-year casualty and property insurance programs for large numbers of unrelated insureds which engage in the same trade or occupation.

3.     These groups of similarly-situated insureds are referred to as "purchasing groups."  A purchasing group is any group composed of members who business or activities are similar or related with respect to the liability to which members are exposed by virtue of any related, similar or common business, which has been formed for the purpose of providing insurance on a group basis.

4.     Elmasri formed several not-for-profit corporations in which Elmasri was the sole member.  In general, these corporations would act as the principal "named insured" in the insurance policy for the purchasing groups, and members of the groups would then become covered under the policy, pay premiums to the insurer through Aramarine, and Aramarine would retain a part of the premiums as its commission.

5.     Aramarine began working with OneBeacon's predecessor, General Accident, and related companies in approximately February 1995.

6.     The unit at General Accident that Aramarine dealt with in 1995 at the beginning of Aramarine's relationship with General Accident was called the Global and National Accounts underwriting unit, which was headquartered in Philadelphia.

4

7.      Beginning in 1995 and continuing until 2000, Aramarine established a number of purchasing group insurance programs with insurance policies issued by General Accident or related insurance companies for not-for-profit corporate entities that, in general, Elmasri incorporated as the principal named insureds.

8.      Aramarine also worked with Kaye Insurance Associates, another broker, on a purchasing group called the Associated Restaurant Management, Inc. (or "ARM") purchasing group that was formed to obtain group insurance coverage and rates for owners and operators of restaurants, bars and taverns and catering establishments.

The Broker's Agreement

9.      Aramarine entered into a Broker's Agreement with General Accident and six related insurance companies, including defendant Potomac Insurance Company of Illinois, dated March 15, 1995. (Plaintiff's Exhibit ("PX") 10.)

10.     The Broker's Agreement provided that (a) Aramarine as a broker represented the insured, and was not an agent of General Accident; (b) although Aramarine as broker could submit applications for insurance, it had no power to rate, quote, "bind" coverage or perform any underwriting functions; (c) Aramarine was permitted to collect premiums and was required to remit premiums less its commission to the insurer; (d) in the event General Accident refunded any premiums to the insured due to cancellation of the policy or any other reason, Aramarine as broker would return the commission to General Accident; (e) the Broker's Agreement could be terminated at any time by either party; and (f) any termination of the Broker's Agreement would not alter the continued application of the provisions of the Broker's Agreement which would continue to apply to all existing insurance policies which survive termination.  (Id. ¶¶ 2, 3 and 6.)

5

11.     The Broker's Agreement provides that "This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania." (Id. ¶ 11.)

Business Dealings With General Accident Before April 2, 1996

12.     The first purchasing group program that involved a General Accident company providing insurance to various insureds was the ARA Purchasing Group, Inc. ("ARA"). ARA was a non-profit corporation organized by Elmasri to provide insurance coverage for individuals and entities that that owned residential real estate properties predominately in New Jersey and some other states.

13.     General Accident issued an insurance binder for ARA on March 1, 1995, which was signed by Russel Harding, an Account Executive at General Accident. An insurance binder states the essential terms and conditions of the policy and has the same force and effect as a policy. Per the binder, the ARA policy had a multi-year term of March 1, 1995 to March 1, 1998. (PX-1.)

14.     General Accident issued the ARA policy, policy number CGL 5012570, on March 28, 1995. It was signed by James Dickey, a Vice President and Director and Harding's superior, named ARA as the primary insured, and provided further that new insureds could be added to the policy when ARA filed a list (called a bordereau) of such insureds each month with Potamac. (PX-12.)

15.     In effect, since ARA did not have any employees, Aramarine would issue certificates of coverage for new insureds (who were identified for Aramarine by the various "retail" brokers who brought these insureds to Aramarine) and submit bordereaus to General Accident identifying the insureds Aramarine added to the program.

16.     During the first year of the ARA policy, most of the new insureds that were added to the policy were brought to Armarine by a retail broker, Chernin Gruppuso &

6

Schulman, Inc. ("CGS"). On March 9, 1995, Aramarine and CGS had entered into an agreement (the "exclusivity agreement") that (a) gave CGS exclusive control over insureds (called "accounts" in the agreement) that could participate in the ARA programs; (b) named Aramarine as CGS's exclusive broker regarding placement of any business with General Accident; and (c) thus precluded CGS from bringing any business to General Accident unless it did so through Aramarine. (PX-22.) This was a very lucrative arrangement for both CGS and Aramarine; during the one-year period March 15, 1995 to April 2, 1996, Aramarine received more than $486,000 in commissions from business from CGS to General Accident from ARA and other accounts.

17.    INTENTIONALLY OMITTED

18.    On June 1, 1995, General Accident issued a second purchasing group policy, policy number CGL 5012577, to the Associated Restaurant Management ("ARM") purchasing group, consisting of small restaurant owners, and later, bar and tavern owners (traditionally a difficult class to obtain insurance for), high-end restaurants (called "white table cloth" establishments) and caterers. The ARM purchasing group was created by a broker named Kaye Insurance Associates ("Kaye"), and the group was located in Warwick, Rhode Island. (PX-20.)

19.    By "irrevocable" letter dated May 25, 1995, Kaye appointed Aramarine as its "exclusive placing broker with the company [Kaye] as long as the coverage [for the ARM members] remains in force and for renewals thereof with General Accident." (PX-62.)

20.    The first ARM policy was for a sixteen month period, effective June 1, 1995 to September 30, 1996, and provided that the "named insured" was the "Associated Restaurant Management and individual participants thereof," as listed with the insurer on the

"bordereau" (the monthly list of insureds) filed by Aramarine with the insurance company (PX-20.)

21.     In the early part of 1996, Elmasri proposed that General Accident issue a multi-year policy for another purchasing group program, called the NAA Purchasing Group, Inc. ("NAA") for owners of residential multi-family dwellings, and that General Accident grant Aramarine underwriting authority for this program. (PX-2.)

22.     Toward the end of 1995, friction developed between and among Aramarine, CGS, Marsh & McLennon ("Marsh"), one of the world's largest commercial insurance brokers, and General Accident.

23.     Elmasri had submitted a proposal from Marsh for coverage for a firm called Tower Management Services ("Tower"), which General Accident accepted. Shortly thereafter, Leslie Nylund, a broker with Marsh, complained to General Accident's senior management that Marsh should not have to deal with General Accident through Aramarine.

24.     On November 13, 1995, less than two weeks after the Tower policy was issued, Harding sent Elmasri a letter containing the "unusual" request that Elmasri put a "moratorium" on any new submissions from Marsh. (PX-5.)

25.     On April 2, 1996, Gruppuso faxed Elmasri a letter telling him that the exclusive placement agreement notwithstanding, CGS would "prefer" to deal with General Accident through Marsh. He offered to buy out CGS's obligations by paying $5 for each apartment unit covered by the ARA policy in lieu of Aramarine's commissions. (PX-24.)

26.     On the same day, April 2, 1996, Harding informed Elmasri by facsimile that CGS (which controlled ARA) was in the process of terminating ARA's members' coverage with General Accident. (PX-25.)

8

27.     On April 2, 1996, Dickey informed Elmasri that General Accident wanted to establish a direct relationship with Marsh, and most immediately with regard to a particular book of business that CGS controlled, called the "Chubb book of business," without Aramarine's involvement, that Marsh wanted to deal with General Accident but without Aramarine, and that the Aramarine-CGS exclusivity arrangement was a "barrier" to General Accident doing business with Marsh. Dickey advised Elmasri that Harding would be calling him to discuss the Aramarine-CGS agreement later that day.

The April 2, 1996 Telephone Conversation Between Elmasri and Harding

28.     On April 2, 1996, Harding contacted Elmasri by telephone. Elmasri tape recorded the telephone conversation. (PX-27.)

29.     During the telephone conversation, Harding informed Elmasri that CGS wished to present a book of business, called the Chubb business, to General Accident through Marsh without Aramarine's involvement. (Id.)

30.     The exclusivity agreement between Aramarine and CGS precluded CGS from presenting such business to General Accident through Marsh without Aramarine's involvement (and without having to share commissions with Aramarine.) (PX-22; PX-27.)

31.     Marsh contacted General Accident's Senior Vice President, Robert Kerr, about placing the "Chubb book of business" (which had been brought to Marsh by CGS) with General Accident. Marsh informed General Accident that it did not want to deal with Aramarine as necessitated by the exclusivity agreement between Aramarine and CGS.

32.     General Accident's Senior Vice President, Robert Kerr, and its President, Frank Coyne, wanted General Accident to write business directly with Marsh without Aramarine's involvement, and wanted the exclusivity agreement, in Harding's words, to "go away." Kerr conveyed that message to Dickey and Harding and told them that he expected

9

them to induce Elmasri to give up his exclusivity. Dickey directed Harding to carry out this directive. Kerr did not tell Dickey and Harding that they could offer Elmasri anything in order to induce Elmasri to give up his exclusivity. Dickey told Harding to call Elmasri and try to ask him to just make this agreement go away.

33.     On April 2, 1996, Harding telephoned Elmasri. A transcript of their conversation, which Elmasri taped, is Defendants' Exhibit ("DX") 2. In that conversation, Harding told Elmasri that "upper management" at General Accident wanted the exclusivity agreement to "go away" and asked Aramarine to "work something out with CGS." (Id. at 2.) Harding told Elmasri, "I was asked to call and discuss it with you and see . . . to see if you would be agreeable to it." Harding asked that Elmasri to do this "as a favor to us" (Id.)

34.     Elmasri asked for a meeting to discuss it further, but said "I mean . . . I'll do what's necessary in general and especially if you're asking me on a personal note." (Id. at 3.) After saying this, Elmasri asked Harding, "Is General Accident prepared to commit to me anything?" (Id.) Harding started out by saying, "We have already committed to writing business with you and we're . . . looking at the NAA program . . . ." (Id.) Shortly thereafter, Harding said, "We committed to working with you. We're going to do your NAA deal, we're going to write Sbarro's and anything you bring in to us. You have a market here with GA as competitive as it's been in the past." (Id. at 4.) However, Harding declined to commit to any dollar volume of business that GA would do with Aramarine (See id. ("How many dollars in volume are committed? I can't say . . . .").) Instead, he said, "We will be as competitive with you as we are now on whatever you submit," (id. at 5) and "You're going to get the same kind of prices, you're going to get the same kind of treatment and the same kind of service. This is not going to be affected by this unfortunate circumstance involving CGS." (Id. at 6.) Harding again reiterated, in response to a direct question, that, "NAA will get done, it's not finalized as

10

to how we're going to do it for you, but it is going to be done for you," and "GA is committing to you to offer you that deal." (Id. at 8.) Elmasri asked for a letter to show to his customers, indicating, "We are very close, look: we have a commitment from the market which is devising the final structure," and Harding said, "I don't think that's a problem," (id.) and once again said, "As I said, we will go through with the NAA program with you." (Id. at 9.) Confessing that he did not find the call pleasant, Harding said, "you have GA as a complete market for any business you want to bring in, but they would just like you to do us a favor, and negotiate whatever settlement you can [with CGS]" (id.), to which Elmasri responded, "OK." Harding expressed sympathy, saying, "I do understand what you're thinking," but Elmasri protested, "You know what I'm thinking? You don't know what I'm thinking, 'cause what I'm thinking is not, probably what you're thinking." (Id.) Harding apologized, and then said, "I do think in the long run we will write business for you and I think we can make the income up." (Id. at 10.)

35.     The conversation continued for some time, but eventually returned to the subject of how unpleasant the call was for Harding to make. There followed the following exchange:

| Russ [Harding]: | You know we do have a relationship with you which we value, whether you think that or not. |
| --- | --- |
| Joe [Elmasri]: | I know you do. |
| Russ: | We value the relationship very highly and we're going to make the relationship work in the future. |
| Joe: | What's your anticipation? We'll be able to write business with you for how long? You think we'll have a facility with GA for three years, five years, two years? |
| Russ: | I would say as long as you want to have a facility with us. K don't think this Marsh thing affects you in any way as far as . . . . |
| Joe: | You don't think that right after this Marsh is going to look to push us out the door completely? |

11

| Russ: | No. I don't think they can. |
|---|---|
| Joe: | OK. |
| Russ: | Frankly, I don't think they can. This deal with Marsh is a limited deal with the extent of the area . . . . |

(<u>Id</u>. at 16-17.)

Plaintiff alleges in this lawsuit that this constituted a commitment from GA, represented by Harding, that if he waived his rights under the CGS exclusivity agreement, GA would modify Paragraphs 2 and 6 of the Brokerage Agreement in the following ways: (1) whereas the Brokerage Ageement expressly denied Aramarine any underwriting authority, GA was conferring on Aramarine the authority to underwrite insurance policies for members of the purchasing groups, subject only to underwriting guidelines developed jointly by Aramarine and GA; (2) whereas the Brokerage Agreement could be terminated at any time, GA was renouncing this and promising that Aramarine could continue to underwrite individual policies for members of purchasing groups for the foreseeable future, including, at a minimum, the duration of any multi-year group contracts issued by General Accident.

36.     Harding was not the General Accident underwriter working on the NAA deal, but it was his understanding from Dickey that General Accident was going to do the NAA deal. However, Harding also thought it possible that if Elmasri did not agree to waive Aramarine's exclusivity agreement with CGS, General Accident would terminate Aramarine's Broker's Agreement with General Accident. He wanted to assure Elmasri that General Accident would continue to do business with Aramarine in the future if Elmasri waived exclusivity.

37.     The Broker's Agreement was not mentioned at all during the telephone call. There was no explicit discussion about granting Aramarine any underwriting authority in connection with any particular purchasing group, or with the purchasing groups generally, and

while there were discussions about Aramarine's "writing business," there was no suggestion that Aramarine was asking for, or that General Accident was granting, any authority that did not already exist. Harding did not explicitly commit to doing any particular dollar amount of business with General Accident, or to any particular term for the parties' relationship to continue.

38.     There is no evidence that Harding was given any authority to modify the Brokerage Agreement. Harding did not understand that the conversation had anything to do with the Brokerage Agreement, or believe that he had modified it in any particular.

39.     No one communicated to Elmasri that Harding had any authority to bind General Accident to a modification of the agreement.

40.     Harding left the conversation thinking that Elmasri would give up his exclusivity. Elmasri did not ever put his waiver in writing, but shortly after the April 2, 1996 telephone conversation, CGS terminated its real estate (ARA) business with Aramarine, and Elmasri never sued or otherwise protested this. CGS thereafter placed its ARA business elsewhere, albeit not with General Accident.

41.     If Elmasri believed that he had obtained a significant modification of the Brokerage Agreement, he did nothing to codify that modification. Elmasri never asked General Accident to confirm the terms of the modification in writing. He did not send any letter saying, "Confirming our understanding, I am waiving my right to enforce the CGS Exclusivity Agreement in exchange for the following modifications to our 1995 Broker's Agreement . . . ." Elmasri testified at trial that he asked Dickey to place the modified terms of the Broker's Agreement in writing, but the Court specifically does not credit this testimony. Elmasri's demeanor when he was asked by opposing counsel whether he ever asked to have the modifications put in writing—he paused for a considerable period, obviously thinking, and then said, "Yes." When asked the inevitable follow-up question (whom did you ask to put it in

13

writing) he hesitated again, and then (as seems to be his wont) answered that he asked a person who is unable to testify because of brain damage (Dickey) to send him written confirmation of the fact. Having observed the witness' demeanor and considered what he said, the Court concludes that this is simply not credible testimony.

42.    Indeed, there is no evidence whatever in the record that Dickey or any other "higher up" at General Accident was ever advised, by anyone, that the Broker's Agreement had been modified to eliminate, for five years, General Accident's right to cancel the contract, and to grant Aramarine underwriting authority extending for the entirety of that five year period, on all policies that might be issued. Harding never communicated any such information to Dickey or Kerr, and there is certainly no credible evidence that Elmasri spoke to anyone higher up at General Accident than Dickey in order to assure himself that there had been a modification of the Brokerage Agreement. Given Elmasri's repeated statements to Harding during their conversation to the effect that he did not trust the higher ups at General Accident, it is simply incredible that a sophisticated businessman like Elmasri would proceed on the basis that he had an unbreakable contract, for at least five years, with underwriting authority that extended until the end of cancelled policies, in an industry where such matters were, by plaintiff's own concession, not common, without getting that commitment from the insurer from one of the "higher ups" whom he believed had no consideration for his interests.

43.    There is no credible evidence that anyone at General Accident ever gave Elmasri reason to believe that Harding had apparent authority to modify the Broker's Agreement. Dickey called Elmasri before Harding did and alerted Elmasri that Harding would be calling to discuss the parties' relationship and the CGS exclusivity agreement. It would not be reasonable for Elmasri to conclude that this gave Harding authority to modify the contract that underlay the parties' business relationship.

14

44.     Dickey and Kerr delegated Harding to get Elmasri to agree to waive his exclusivity rights, and gave him discretion to figure out how to get it done. Whether this constituted actual authority to modify the Broker's Agreement is, ultimately, irrelevant. Harding had no understanding that he ever agreed to any modification of that contract; he testified, credibly, that he did not even understand that he and Elmasri were discussing any modification of the Broker's Agreement. Furthermore, Harding testified, credibly, that if he had understood that he was working modifications of the Broker's Agreement, he would have forwarded the information to the Legal Department so that a written modification document could be drafted and signed. Of course, he did nothing of the sort.

45.     Harding did tell Dickey that he had assured Elmasri that Aramarine would have a long-term business relationship with General Accident (although there is no evidence that Harding told Dickey that he had committed to five years, because Harding had no such understanding). This reflects exactly what occurred in the taped conversation. Harding clearly *did* tell Elmasri, repeatedly and emphatically, that Aramarine would continue to have a business relationship with General Accident, on the same terms as in the past. If this constituted some sort of modification of the Broker's Agreement, then there has been no breach, because Aramarine did have a long-term business relationship with General Accident, on the same terms as in the past, after the April 2 phone call. The relationship lasted for four more years. The relationship continued on the same terms as previously governed by the Broker's Agreement, issuing policies to purchasing groups put together by Aramarine, with underwriting authority ceded to Aramarine on a case by case basis (although such was not required under the Broker's Agreement), with new insureds added pursuant to underwriting guidelines that were created jointly by General Accident and Aramarine (but always subject to General Accident's right to decline to accept any particular risk within the first sixty days after it was bound), and with

Aramarine receiving the same level of service and premiums that it had enjoyed prior to April 2, 1996.

46.     Prior to the April 2, 1996 conversation, Elmasri had been given underwriting authority in connection with the ARA and ARM Purchasing Groups. Indeed, in September 1996—five months after Harding supposedly modified the Agreement—Elmasri drafted a letter in which he, *inter alia*, "offer[ed] a brief restatement of our business activities with GA." (DX-38.) In this letter, he admitted that he had been doing underwriting on the ARA Purchasing Group since March 15, 1995, and also stated that all new business done through the ARM group "is underwritten and approve [sic] or declined by ARAMARINE in accordance with the governing Underwriting Guidelines." (Id.) Elmasri went on to say, "The American Hotel International Group is a Risk Purchasing Group . . . Presently, ARAMARINE enjoys no underwriting authority for this Group. We anticipate that as the membership grows, ARAMARINE will be granted underwriting authority." (Id.) Elmasri ended the draft letter by suggesting that General Accident write a "To whom it may concern" letter that Aramarine could show to brokers indicating that, "ARAMARINE enjoys specific underwriting and binding authority for GA, *for specific lines of business*." (Id. (emphasis added).) These statements are flatly inconsistent with Aramarine's current position that Harding eliminated all restrictions on underwriting in connection with purchasing group policies in the April 2 conversation. While the draft letter was never sent to General Accident (though *not* because Elmasri received a different letter (PX-90)—nine months later—that ostensibly suited his purposes, as Elmasri testified), the Court concludes that Elmasri was endeavoring to be completely accurate about the nature of his relationship and his authority vis a vis General Accident when he drafted the letter. And the Court accepts as accurate Elmasri's affirmative statement that he had binding authority

only when it suited General Accident to concede such authority to him—"for specific lines of business."

Silver Car Purchasing Group Policy and Other Livery Business

47. On September 25, 1998, General Accident issued an insurance binder, and thereafter, on November 18, 1998, a policy, policy number BA0070762, to another purchasing group, known as Silver Car, for the livery car business, including owners and operators of limousines and other private livery vehicles. The policy ran for the period October 1, 1998 to October 1, 2001; it was signed by Freyberger. The policy authorized operations in New York or New Jersey. (PX-47; PX-48; PX-49.)

48. The Silver Car binder and policy provided for liability coverage for any "AUTO BOUND BY AUTHORIZATION OF ARAMARINE BROKERAGE, INC. REPORT TO BE PROVIDED BY MONTHLY BORDEREAU TO CGU." (See PX-48, 49 (the "schedule of autos you own" page in the policy).) As this policy language states, Aramarine was authorized to add insureds to the policy, issue certificates of insurance, and report new risks it bound to General Accident by monthly bordereau. (PX-47; PX-48.)

49. On February 26, 1999, General Accident extended the Silver Car policy from an end date of October 1, 2001 to February 28, 2002, in order to coincide with the date New York livery business insurance policies are required to renew. By reason of the extension, Aramarine had authority to add members to the Silver Car for coverage policy through February 28, 2002, once all regulatory steps were completed. (PX-50.)

50. In connection with the Silver Car policy, on November 19, 1999, by facsimile, CGU submitted an invoice to Aramarine for $12,000 premium, less $2,400 for Aramarine's commission, and in February 2001, Aramarine paid the net premium of $9,600, which CGU accepted. (PX-51; PX-52.)

17

51.     Aramarine never added a single insured to the Silver Car program under this policy.  Originally, the necessary rate applications were not timely submitted to the New York State Department of Insurance (the "Department.")  Eventually, the Department approved rates for Silver Car, but that did not occur until February 28, 1999—too late for Aramarine to bind livery business under the Silver Car policy for General Accident in 1999.  Furthermore, the rates approved by the Department were higher than the rates that Aramarine had planned to charge.  (PX-55.)

52.     In 1999, Aramarine entered into an arrangement with another broker, PRG Brokerage, Inc. ("PRG"), which had expertise and extensive contracts in the livery line of business.  The two brokers agreed to work together to generate auto-for-hire business and place it with insurance companies with which each of them (Aramarine and PRG) had contacts, and to share commissions with one another.  (PX-54.)

53.     On August 1, 1999, Aramarine and PRG entered into a Co-Brokering Agreement, which provided for, among other things, a commission split for any business placed by PRG in the Silver Car purchasing group insured by any of Aramarine's "markets," which included General Accident, CGU or Highlands, or any of PRG's "markets," which included Firemans Fund, Legion and other companies.  (PX-54.)

54.     Aramarine placed millions of dollars of business (premiums) in the Silver Car purchasing group with another insurance company called Highlands Insurance Company. None of the business was placed with General Accident.

55.     The Silver Car policy remained in full force and effect through its February 28, 2002 policy expiration, although Aramarine did not pay the premium that was billed in November 1998 (PX-51) until many months after CGU ended its relationship with Aramarine.  (PX-52.)  However, as will be seen, defendant's actions in August 2000 effectively

18

precluded Aramarine from binding insurance risks under the Silver Car policy. (PX-48; PX-49; PX-50.)

56.     At the beginning of 2000, General Accident (now known as CGU) and Aramarine discussed doing additional livery business. Elmasri agreed with CGU to write a limited amount of business through a new livery purchasing group, which Elmasri incorporated and which was called Livery PG, Inc. ("Livery PG"). In February 2000, Aramarine, PRG and CGU entered into a series of agreements relating to this new venture.

57.     On February 7, 2000, CGU issued seven separate insurance binders (for different categories of risk), signed by Chuck Woodrich of CGU, to Livery PG for the period March 1, 2000 to March 1, 2003. These one-page binders are dated January 26, 2000 and are numbered consecutively BA 0070828, BA 0070829, BA 0070830, BA 0070831, BA 0070832, BA 0070833 and BA 0070835. They provide for an annual premium "cap" of $6 million, which included $5 million for so-called "Black Cars" and $1 million for limousines. (PX-58.)

58.     On February 9, 2000, Aramarine and PRG entered into an "Amended and Restated Co-Brokering Agreement," which provided for a commission sharing arrangement for business placed in both the Silver Car and newly-formed Livery PG policies. (PX-56.)

59.     On February 7, 2000, CGU, Aramarine and PRG entered into a Program Manager Agreement. (PX-57.) By its express terms, it governed the parties' relationship in connection with something called "Livery Business." Livery Business was a defined term in the contract: "The term 'Livery Business' shall have the meaning set forth in the Co-Brokering Agreement between PRG and Aramarine . . . attached to this Agreement as Addendum A." The Co-Brokering Agreement defines "Livery Business" as "liability insurance for owner, operators and drivers of 'Black Car', '*Silver Car*', limousine livery automobiles and taxicabs." (PX-56 § 1(f) (emphasis added).) Furthermore, the Program Manager Agreement by its terms "applies to

19

all insurance business produced for CGU by PRG (the "PRG Business"). (PX-57.) This
Agreement *applies to all Livery Business produced for CGU by Aramarine* . . . and does not
supersede, modify or amend any prior agreements between Aramarine and CGU." (Id.
(emphasis added).) Therefore, by the clear, unambiguous terms of the Program Manager
Agreement, all business that was once contemplated to be placed under the Silver Car umbrella
policy (which business falls squarely within the definition of the term "Livery Business") was
subject to the Program Manager Agreement.

      60.     The Program Manager Agreement appointed Aramarine and CGU as
managers "to operate as the exclusive Managers for CGU, in accordance with and subject to the
provisions of this Agreement, but . . . only with respect to the policies listed in Addendum E
(hereinafter the "Program Policies")." (Id.)

      61.     The Program Policies are the binders referred to in Finding of Fact 56
above.

      62.     There is no necessary inconsistency between the fact that "Livery
Business" is expressly defined to include Silver Car business and the fact that the Program
Manager Agreement limited Aramarine and PRG's management authority to the seven policies
issued pursuant to the Black Car (Livery PG) Policy. The only policies under which any cars or
drivers were actually insured as of the effective date of the Program Manager Agreement
(February 7, 2000) were the seven Black Car policies evidenced by the binders referred to in
Paragraph 56 and in Addendum E to the Agreement. While the Silver Car Group policy had
been issued, it had never been used to insure any car or driver, and no premium had ever been
paid to keep that policy in force. The only conclusion one can draw from the failure to list the
Silver Car policy in Addendum E—despite the undeniable fact that Silver Car business fell
squarely within the contractual definition of "Livery Business"—is that the Silver Car Group had

been effectively abandoned by Aramarine insofar as its dealings with CGU were concerned, in favor of the Livery PG Inc. Group and its business. This is completely consistent with all other evidence.

63.     Aramarine's abandonment of any effort to place business with CGU under the existing Silver Car policy is confirmed, not only by its continuing failure to pay the premium associated with that policy, but also by a letter sent to CGU by Elmasri the day after the effective date of the Program Manager Agreement. (DX-13) In that letter, Elmasri says. "As you are aware, Silver Car Purchasing Group, Inc. held back from writing any business in the '99 season. Therefore, we have been informed by our attorneys and agreed our manual can *only* be used in conjunction with our purchasing group, Livery Purchasing Group, Inc." (Id. (emphasis added).) Since Silver Car had not written any business at the time the Program Manager Agreement became effective, and since Silver Car's creator indicated to the insurer that Silver Car's manual could be used "only" in conjunction with Livery PG (and so could not be used in conjunction with the Silver Car Group), the failure to list the Silver Car Group policy in Addendum E necessarily meant that Silver Car was not going to be used by Aramarine as a vehicle for Livery Business placed with CGU. The parties would have had to amend Addendum E to specifically list that policy if any group program using the Silver Car Group policy were activated—because such business clearly fell within the definition of "Livery Business" and so was subject to the Program Manager Agreement—but there was no need to list it at a time when Elmasri's own words and actions indicated that the policy was not going to be used for any purpose.

64.     Aramarine first tendered the premium for the Silver Car policy in February 2001—long after the policy had been issued, long after the premium was due and overdue, and long after GA/CGU had terminated Aramarine's authority to underwrite any business under the Program Manager Agreement. The conclusion that this was a stratagem

designed to bolster Aramarine's litigation position, rather than an indication that Aramarine had intended all along to write business under the Silver Car umbrella, is inescapable.

65.    This is not to suggest that the Silver Car policy was somehow rendered "null and void" by virtue of Aramarine's election to go forward with whatever Livery Business it planned to write under the Livery PG umbrella—even though Aramarine was in default of its obligation to pay the premium due for that policy from the inception of the policy period. It was still necessary, as a matter of New York law, for CGU to send a notice of cancellation prior to the expiration of the policy period (in 2002). But that was a purely ministerial act; no business had been written and so there was nothing to run off after GA/CGU ended its relationship with Aramarine. In accordance with the law, on November 1, 2001, CGU issued a notice of non-renewal of the Silver Car policy. (PX-59.)

The End of the Relationship Between GA/CGU and Aramarine

66.    In or about the Summer of 2000, CGU changed its business strategy to concentrate on small, regional businesses and discontinue national accounts, including termination of its participation in multi-year purchasing group programs. (PX-15; PX-16; PX-17; PX-18; PX-19.) This strategic change followed unsuccessful efforts by CGU, which was losing money on the purchasing group policies, to induce Aramarine to agree to changes in its programs that would make them profitable for CGU. Insofar as Aramarine was concerned, this change was effected in a number of sequential steps.

67.    By letters dated May 30, 2000 from Woodrich, GCU's Vice President, CGU limited Aramarine's long-standing authority to "quote, bind new or renewal business" under the NAA and ARA programs, except for accounts that produced less than $250,000 in premiums. Woodrich also prohibited Aramarine from "rolling" (transferring from another

carrier) an existing book of business to these programs without CGU's prior approval. (PX-64; PX-65.)

68.     By three letters dated July 20, 2000 from Woodrich, CGU suspended the acceptance of new business, effective October 1, 2000, for the ARA, NAA and ARM programs. (PX-66; PX-67; PX-68.)

69.     By letter dated August 1, 2000 from Woodrich, CGU confirmed that it was changing its strategic direction, stating as follows as to the NAA property program: CGU has "embarked in a new direction with our property underwriting strategy. The type of property that would potentially be placed within the policy provided you does not fit with the new direction our strategy is taking us. Therefore, effective immediately, we withdraw all authority provided you with respect to this policy. We will be sending notice of cancellation very shortly." (PX-69.)

70.     By letter dated August 15, 2000 from Woodrich, CGU terminated its relationship with Aramarine. (PX-70.)

71.     By letter from Woodrich dated August 29, 2000, CGU terminated the Program Manager Agreement, effective February 28, 2001. (PX-73.) The agreement by its terms could only be terminated on 180 days notice. In this letter, Woodrich confirmed that "the Company no longer underwrites risk purchasing group programs." (Id.)

72.     By letter dated August 15, 2000 to Woodrich, responding to his August 1 and 15, 2000 letters, Elmasri advised Woodrich that CGU's actions "are part of an effort to reduce the volume of business we [Aramarine] place with your company" and are "in breach of agreements between [Aramarine and CGU] and will cause Aramarine to suffer considerable damage." Elmasri further asserted that CGU's actions violated paragraph 6 of the Broker's Agreement, which provides that termination "shall not alter in any way the continued application

23

of the provisions of this Agreement which shall survive termination and apply to all insurance policies effected prior to the date of termination." (PX-71.)

73.     The next day, by letter dated August 16, 2000 CGU's General Counsel confirmed CGU's termination of its relationship with Aramarine and revocation of Aramarine's authority to rate, quote, bind coverage, issue policies or perform underwriting functions, although she stated that Aramarine could submit business for CGU's review and approval. (PX-72.)

74.     A number of purchasing group policies issued pursuant to the business dealings between CGU and Aramarine were still in effect as of the date CGU terminated the Broker's Agreement. However, all of those policies contained "free look" periods, during which the insurer could reject any new insured for any reason whatever. Thus, CGU was not obligated, as a matter of law, to accept any new insureds tendered to it by Aramarine under the multi-year policies it had issued for the purchasing groups. Since CGU unequivocally expressed its intention to cease doing business with purchasing groups, Aramarine could not have earned any additional income by adding new insureds to the policy following CGU's decision to terminate its relationship with Aramarine in August 2000.

75.     What GA/CGU could not do—and what it did not do (although it tried to, at least in connection with Livery Business)—was unilaterally cancel insurance for existing members of those groups until the policies finally expired. This was confirmed, in connection with the Livery PG policies (i.e., those policies listed on Addendum E to the Program Managers Agreement), by the Department, which wrote a letter to CGU prohibiting it from unilaterally terminating coverage it had previously bound through March 1, 2003, but only for "those members for whom coverage has been in place for sixty days or longer because the provisions of

24

[N.Y. Ins. L.] Section 3426 generally apply on an individual basis." (PX-87.) For that reason, all the policies continued in force until their expiration dates.

      76.    While CGU did not unilaterally cancel any existing policyholder's insurance, CGU did ask ARM insureds to terminate insurance coverage before policy expiration during the non-cancellable extension period. (PX-13; PX-74; ¶¶ 5, 8; PX-78, ¶ 8.) At CGU's request, an entity called Kaye placed the ARM insureds with two other carriers, which issued new policies. Naturally, Aramarine did not receive any commissions relating to such new policies. (PX-13.)

      77.    Under the express terms of the Program Manager Agreement, Aramarine's underwriting authority automatically ceased when CGU notified Aramarine that it was exercising its right to cancel that agreement on 180 days' notice. Therefore, once CGU sent the notice referred to in Finding of Fact 70, Aramarine immediately lost any authority it previously had to add new insureds to the Livery Business—and with it, the ability to earn premiums by adding those new insureds.

      78.    At no time during their relationship did GA/CGU issue any policy with a duration longer than three years. Defendant did renew some two or three year policies for additional terms of two or three years, so that those policies were in effect for longer than three years; but no policy was ever issued with a term of five years.

**For the Court's Conclusions of Law:**

      1.    OneBeacon is entitled to judgment on Aramarine's breach of contract affirmative claim. No enforceable promise or modification to the Broker's Agreement was made during the April 2, 1996 phone conversation. Even if there were such a promise, defendant fully performed anything that was actually promised by continuing to do business with Aramarine until August 2000.

2.     The statements made by Harding during the April 2, 1996 phone call do not rise to the level of a "promise" that Aramarine can enforce, let alone evidence the two-pronged promise that Aramarine would have the Court find: one that both (i) conferred unlimited underwriting authority (subject to underwriting guidelines) on Aramarine in connection with the program purchasing groups, and (ii) renounced GA's contractual right to cancel the Broker's Agreement at will at any point during its term. As noted in the Findings of Fact, the parties never once mentioned the Broker's Agreement during the April 2, 1996 telephone call. They did not discuss extending Aramarine's underwriting authority beyond that already conferred on ad hoc basis. It is quite obvious that GA had elected to waive the Broker's Agreement's prohibition on underwriting by Aramarine in connection with certain Program Groups; but even that was not a wholesale grant of underwriting authority, as Elmasri himself admitted (six months after the purported modification) when he wrote that he did not yet have underwriting authority with respect to at least one purchasing group. There was absolutely no discussion of allowing Aramarine to continue binding business either for a fixed number of years or until the expiration of a particular purchasing group's policy even after GA sent notice that it was not going to renew the policy. Harding carefully refused to commit GA to any specific dollar amount of additional business with Aramarine or to any specific term of years for the Agreement. When asked for his opinion about whether the business arrangement between Aramarine and GA might continue for "five years, three years, two years," all Harding would say was, "As long as you want"—and Elmasri did not follow up by saying, "OK, I want five years." The parties did not discuss, *in haec verba* or otherwise, any requirement that GA would not cancel its arrangement with Aramarine for the duration of the purchasing group policies then in force, or for any other period connected to the duration of the policies.

3.      The exchange relied upon by Aramarine to establish the purported

modification is as follows:

> Joe:    What's you anticipation?  We'll be able to write business
> with you for how long?  You think we'll have a facility with GA
> for three years, five years, two years?
>
> Russ:  I would say as long as you want to have a facility with us.  I
> don't think this Marsh thing affects you in any way . . .

(DX-2 at 16.) This statement reflects only what Mr. Harding *thought* the relationship would be

like in the future.  (Id.) Harding was not asked for a commitment; he was asked for "your

anticipation" about how long the parties relationship would continue.  ("What's your

*anticipation*? . . . You *think* we'll have a facility with GA for three years, five years, two

years?") (emphasis added).  Such statements of opinion or prophecy are not "promises" upon

which a contract can be based.  *See* 1 Williston On Contracts § 1:2 (4th ed. 2007) ("A promise

must also be distinguished from a mere statement of intention or of opinion and from a

prophecy.") (citing Sec. Bank & Trust Co. v. Bogard, 494 N.E.2d 965, 969 (Ind. App. 1986)

("For example, when a father asked a doctor how long his son would be in the hospital and the

doctor replied, 'Three or four days, not over four,' the doctor was not liable when the son

remained in the hospital for over a month because the doctor had made a prediction and not a

promise.")).  For controlling authority, see Overall v. Univ. of Pennsylvania., 412 F.3d 492, 498-

99 (3d Cir. 2005) (ruling that a response to whether somebody could "put odds" on the

likelihood of an action could not result in a "promise"); Burton Imaging Group v. Toys "R" Us,

Inc., 502 F. Supp. 2d 434 (E.D. Pa. 2007) (ruling that a statement that "we're going to move

ahead with you" was not a "promise").  Harding's statement was neither a promise that the two

companies would continue to do business for five years, or for the length of any policies issued

by GA pursuant to their business relationship, nor a promise that Aramarine would continue to

enjoy underwriting authority (by which plaintiff means the authority to continue adding new insureds to existing policies) until the date those policies expired—even if GA/CGU had notified Aramarine that the policies would not be renewed but would instead be run off until coverage expired.

4.     Although his "as long as you want" remark is not an enforceable promise as a matter of law, Harding did assure Elmasri, repeatedly, that if he gave up his exclusivity arrangement with CGS, so that Marsh could present CGS's business proposal to GA, Aramarine's relationship with GA would continue, in the same manner and with the same degree of commitment, as it had in the past. Harding clearly believed that he had made a commitment to Elmasri in this regard; he reported to Dickey and Kerr, his superiors, that he had assured Elmasri that Aramarine would not be terminated any time soon by GA, but would enjoy a long-term business relationship. Accepting this as a promise, it is not a promise that the two companies' relationship would continue for any specific or fixed term of years, as plaintiff contends. It is not necessary that this Court figure out how long "long-term" is, because under any reasonable interpretation of the term, GA/CGU complied with that "agreement." The undisputed evidence before the Court establishes that defendant continued to do business with Aramarine through August of 2000—almost four and one half years after April 2, 1996 phone call.

5.     Additionally, Aramarine points to Harding's statement that GA would write the NAA business during the call. To the extent that this is construed as a promise made to induce Elmasri to give up the exclusivity, it is not necessary to analyze whether Harding (who was not working on the NAA account) had authority to make the promise, because GA wrote the business.

6.      In short, OneBeacon lived up to its side of the only bargain that was actually struck, by continuing to work with Aramarine for a number of years in a relationship that Aramarine has continued to assert was very profitable for it. There has, therefore, been no breach.

7.      The Court rejects Aramarine's argument that Paragraph 6, the survival provision in the Broker's Agreement, compelled defendant to accept business brought to it by Aramarine under the then effective purchasing group programs after the termination of the parties' purchasing group arrangement.

8.      The survival provision applies only to those terms of the *Broker's Agreement* that survive termination of that Agreement: "Termination shall not alter in any way the continued application of the provisions of this Agreement which shall survive termination and apply to all insurance policies effected prior to the date of termination." (DX-1 ¶ 6.) This provision simply provides that the terms of the Broker's Agreement continue in force during the lifetime of policies in force on the date the Agreement is terminated. It does not address whether Aramarine had any continuing underwriting authority, or whether GA/CGU was obligated to accept business brought to it by Aramarine after defendant indicated that it wanted to run off the existing policies and get out of the purchasing group business altogether. The Broker's Agreement does not address such matters; and it is conceded that GA/CGU had an absolute right to decline any individual risk presented to it by Aramarine, for any reason or for no reason at all, at any time during the life of the program group policies.

9.      Plaintiff does not contend that Aramarine was not paid the commission to which it was entitled in connection with business actually written. Its claim is for commissions on future business that was never written. Since the Broker's Agreement was never modified to provide that Aramarine had non-cancellable underwriting authority—and since defendant had

29

every right to terminate the Broker's Agreement, cancel any underwriting authority it had given Aramarine in connection with specific programs, and get out of the purchasing group business when it did—plaintiff's claim for damages based on business never written necessarily fails. See Matthews v. Phoenix Mutual Life Ins. Co., 316 F. Supp. 1076, 1080 (W.D. Pa. 1970) (obligation to pay commission only runs until the date the arrangement by the parties was validly terminated); see also Robert J. McRell Assocs., Inc. v. Ins. Co. of N. Am., 698 F. Supp. 469, 478 (S.D.N.Y. 1988) ("lost commission" damages limited to the period of time during which underwriting authority by broker/agent could not be validly terminated by insurer).

          10.     Because the claimed modification of the Broker's Agreement was never in fact made, plaintiff's claim for damages for commissions for business Elmasri was unable to write under the Silver Car policy between the summer of 2000 and either (1) April 2, 2001, which is five years after the Harding/Elmasri telephone call, or (2) the ultimate expiration of the Silver Car policy in February 2002, necessarily fails. The viability of that claim is contingent on a finding of an agreement not to terminate the Broker's Agreement, and end the Aramarine/CGU business relationship, prior to either (1) five years after the date of the Harding/Elmasri telephone call, or (2) the termination date for the longest running of the purchasing group policies issued by GA or CGU to Elmasri purchasing groups (it is a clear indication of the flaw in plaintiff's reasoning that it argues that Harding's "as long as you want" remark evidences both a five year non-cancellation commitment and a commitment not to cancel during the life of any policy actually issued—an agreement with such chameleon-like terms is not an enforceable contract). Having found as a matter of fact and law that no such agreement was made, there was nothing wrongful about CGU's cancellation of underwriting authority under all policies issued by GA/CGU, including the unused and unpaid for Silver Car policy.

11.     In any event, the Court has found that the Program Manager Agreement,
by its express and unambiguous terms, governs all "Livery Business" presented to CGU by
Aramarine, including "Silver Car" business. That being so, the terms of the Program Manager
Agreement control. That Agreement was terminable at will by CGU on 180 days notice, and
expressly provided that Aramarine's underwriting authority would end on the day that notice was
given (August 14, 2000). Elmasri freely and voluntarily entered into the Program Manager
Agreement in February 2000—four years after his telephone conversation with Harding—and
assented to its termination provision without ever once asserting the terms of the purported
modification of his Broker's Agreement as a bar to their validity. Aramarine cannot be heard to
complain about the loss of its underwriting authority when the Program Agreement and all
policies thereunder—including Silver Car—and all attendant underwriting authority were validly
terminated pursuant to the terms of the governing contract.

## VERDICT

The defendant shall have judgment as follows:

(1)     against the plaintiff dismissing the complaint, with costs to the
defendant (the Clerk of the Court shall tax costs upon presentation by defendant of a bill of
allowable costs), and

(2)     against the plaintiff on the counterclaim in the amount of $
1,316,520.11 (Docket No. 107), the Court having reinstated the previously-entered judgment on
the counterclaim in its order dated April 6, 2009 (Docket No. 128; see also Docket Nos. 129,
140). The defendant has five business days to alert the Clerk of the Court to interest updates.

31

Upon entry of judgment, the Clerk of the Court shall close the file.

Dated: May 26, 2009

_____
U.S.D.J.

BY ECF TO ALL COUNSEL